**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| Muhammad Al-Mujahidin, ) | Civil Action No. 9:14-1266-BHH-BM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND** |
| ) | **RECOMMENDATION** |
| Daniel Harouff, Daniel Bush, ) | |
| D. Arrowood, Cathy Jones, Michael ) | |
| McCall, in their individual capacity ) | |
| and SCDC, in its official capacity, ) | |
| ) | |
| Defendants ) | |
| _____ ) | |

This action was filed by the Plaintiff, pro se, pursuant to 42 U.S.C. § 1983. Plaintiff,

an inmate with the South Carolina Department of Corrections (SCDC), alleges violations of his

constitutional rights by the named Defendants.

The Defendants filed a motion for summary judgment pursuant to Rule 56,

Fed.R.Civ.P., on January 23, 2015. As the Plaintiff is proceeding pro se, a Roseboro order was

entered by the Court on February 26, 2015, advising Plaintiff of the importance of a dispositive

motion and of the need for him to file an adequate response. Plaintiff was specifically advised that

if he failed to respond adequately, the Defendants' motion may be granted, thereby ending his case.

Thereafter, Plaintiff filed a response in opposition to the Defendants' motion on February 5, 2015,

in which he complains that he had himself filed a motion for an extension of time to file his own

1



dispositive motion January 26, 2016, which had not been ruled on.  See Court Docket No. 52.[1]

Plaintiff's response does not address any of the grounds for summary judgment set forth in

Defendants' motion, a fact pointed out by the Defendants in a reply memorandum filed February 18,

2015.  However, Plaintiff did file a response in opposition to the Defendants' summary judgment

motion, as well as a separate affidavit in opposition, on March 12, 2015 which, although manifestly

out of time, have nevertheless been considered in light of Plaintiff's pro se status.

        The Defendants' motion for summary judgment is now before the Court for

disposition.[2]

### Background and Evidence

        Plaintiff alleges in his verified Complaint[3] that on or about May 26, 2011, he was

"sprayed with in excess of 275 grams of an unknown chemical agent" by the Defendants Harouff and

Bush, both correctional officers.  Plaintiff alleges that he was then placed in a "restraint chair" for

10 hours "without cause".  Plaintiff further alleges that he "repeatedly requested" the Defendants

Harouff and Arrowood (another correctional officer) to be allowed to shower to remove chemical

agents, but that his request was denied and he was not provided an opportunity to shower and remove

---

[1] While Plaintiff complains in this response that the Court had "ignored" his motion for an
extension, the Court granted his motion for an extension on January 29, 2015, and gave Plaintiff
until March 8, 2015 (Plaintiff's requested extension date) to file his own dispositive motion.  See
Court Docket No. 55.  However, Plaintiff never filed any dispositive motion with the Court.

[2] This case was automatically referred to the undersigned United States Magistrate Judge for
all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local
Rule 73.02(B)(2)(d) and (e), D.S.C.  The Defendants have filed a motion for summary judgment.
As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.

[3] In this Circuit, verified complaints by pro se litigants are to be considered as affidavits and
may, standing alone, defeat a motion for summary judgment when the factual allegations contained
therein are based on personal knowledge.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).



the chemical agent, which was "burning his skin", for a period of seven to ten days.

Plaintiff also alleges that the Defendants Bush and McCall (the Warden) instructed the Defendants Arrowood and Harouff to "strip Plaintiff nude" and place him in the restraint chair while covered in mace and denied him access to a shower, and that after he was removed from the restraint chair these Defendants ordered that the water be turned off in his cell. Plaintiff alleges that the Defendant Jones (a nurse) denied him medical treatment "concerning the gas burning his skin"; specifically, that she refused to talk to or treat the Plaintiff, nor would she instruct the other Defendants to allow Plaintiff to shower.

Plaintiff also alleges that on a second occasion, on or about June 20, 2011, he was sprayed "with an entire can of mace" while in the shower by the Defendant Harouff "for no apparent reason". Plaintiff alleges that he was then again placed nude in the restraint chair and not allowed to remove the chemical agent in spite of "pleading" with Harouff and Arrowood to be allowed to do so. Plaintiff alleges that he was kept in the restraint chair for 10 hours, following which he was placed in a "strip cell" for seven days without access to any water "per orders of defs. McCall and Bush".

Plaintiff alleges that these officials were all trained and instructed by the Defendant SCDC to "torture Plaintiff" in the manner alleged, which was all done "per SCDC policy and procedure . . . .". Plaintiff seeks certain injunctive and/or declaratory relief, an order requiring that Harouff and Arrowood be terminated from their employment, as well as monetary damages. See generally, Plaintiff's Verified Complaint.

The Defendants have submitted numerous affidavits and exhibits in support of their motion for summary judgment. The Defendant Michael McCall has submitted an affidavit wherein



he attests that he was the Warden at the Perry Correctional Institution (PCI), where Plaintiff was housed during the relevant time period. McCall attests that he was in the control room of D dorm during the use of force involving the Plaintiff on May 26, 2011, and that he approved the use of a 37 mm[4] in this situation because Plaintiff had barricaded himself in his cell, had a weapon, and was threatening the staff. McCall further attests that following the use of chemical munitions, inmates are allowed to decontaminate using water in their cells, and that he approved Plaintiff's placement in the restraint chair following this incident after he had been examined by medical. McCall attests that he also approved Major Bush's decision to move Plaintiff to the high security wing and to keep the light on in his cell because of Plaintiff's assaultive history and possession of homemade weapons. McCall attests that inmates receive showers on scheduled shower days when they are in compliance with the rules and are not on control cell status. See generally, McCall Affidavit.

The Defendants have also submitted an affidavit from Wade Byrd, who attests that he was a lieutenant assigned to PCI on May 26, 2011, and that he is familiar with the Plaintiff. Byrd attests that on that morning he was directed to the report with the 37 mm to Special Management Unit No. 2, Cell Y-16, where Plaintiff was housed, and that upon arrival he observed Plaintiff barricaded in his cell behind a mattress with something covering his face to hinder the effects of chemical munitions. Byrd attests that Plaintiff was given several directives by Major Bush to throw a homemade weapon out of the cell, but that he refused to comply. Byrd attests that Bush then gave the order for him to fire the 37 mm, and that he then discharged the 37 mm containing Stinger Blackballs in an attempt to strike the floor and then ricochet behind the mattress protecting Plaintiff. Byrd attests that Bush then gave Plaintiff another directive to relinquish his weapon, and that after

---

[4]Apparently some type of device that fires wooden or plastic projectiles.



Plaintiff again refused Bush gave him a second order to fire the 37 mm. Byrd attests that he then discharged the 37 mm containing Wood Baton Blackpowder, striking the right side wall and ricocheting behind the mattress. Byrd attests that Plaintiff then complied with Bush's order to throw the weapon out of the cell. Byrd attests that his use of the 37 mm during this incident was pursuant to the SCDC use of force policy and procedure, and that he did not knowingly violate any of Plaintiff's clearly established constitutional rights. See generally, Byrd Affidavit.

The Defendant Dennis Bush had submitted an affidavit wherein he attests that he was a Major at PCI in May 2011, and that he is familiar with the Plaintiff. Bush attests that on May 26, 2011, Plaintiff was in his cell holding a homemade weapon. Bush attests that he gave Plaintiff a directive to put the weapon down, that Plaintiff refused to comply, and that as a result he [Bush] administered chemical munitions toward Plaintiff's facial area. Bush attests that, nonetheless, Plaintiff still refused to comply with his directives, so he [Bush] administered a second burst of chemical munitions towards Plaintiff's facial area, but that Plaintiff had a towel covering his face and continued to refuse to comply with Bush's orders. Bush attests that he then administered a third burst of chemical munitions towards Plaintiff's facial area, but that Plaintiff continued to refuse to put down the weapon he was holding.

Bush attests that, as a Major, he then authorized the use of a 37 mm. Bush attests that he gave Plaintiff another directive to put his weapon down, and that when Plaintiff again refused to comply he instructed Lt. Byrd to fire a stinger round from the 37 mm into Plaintiff's cell. Bush attests, however, that Plaintiff had a mattress and was behind the mattress, and still refused to turn over his weapon. Bush attests that he therefore instructed Byrd to fire another round, which contained pieces of wood, following which Plaintiff did put the weapon down. Bush attests that



Plaintiff was ordered to slide the weapon under the door and lie face down on the cell floor, and that after Plaintiff's compliance with this directive the inner door was opened and Plaintiff was restrained. Bush attests that the force used in this incident was the minimal amount necessary to gain Plaintiff's compliance, and that following this incident he was seen by Nurse Jones. Bush has attached a copy of the Incident Report relating to this matter to his Affidavit as Exhibit A. Bush attests that, following the incident, Plaintiff was placed in a restraint chair.

With respect to the second incident alleged in the Complaint, Bush attests that following an incident on June 20, 2011, he authorized Plaintiff being placed in a restraint chair at approximately 7:30 a.m. Bush attests that Plaintiff was seen by medical and placed on a 15 minute observation, and that at approximately 11:30 a.m. he extended Plaintiff's Plaintiff time in the restraint chair for an additional four (4) hours after Plaintiff had been afforded a break to walk around his cell and use the facilities. Plaintiff was also again evaluated by medical. Bush attests that Plaintiff was removed from this restraint chair at 3:30 p.m. and allowed to walk around and use the restroom, at which time he became verbally disrespectful and cursed at the staff. Bush attests that Plaintiff was then restrained in the restraint chair for another four hours on his authority. Medical was contacted and Plaintiff was again evaluated. Bush attests that Plaintiff was finally removed from the restraint chair at approximately 7:30 p.m. Bush has attached a copy of the Management Information Notes relating to this incident to his affidavit as Exhibit B. The Management Information Notes reflect that the incident of June 20, 2011 arose out of Plaintiff throwing a bodily substance on an employee and refusing to obey direct orders. See generally, Bush Affidavit, with attached Exhibits.

The Defendant D. Harouff has submitted an affidavit wherein he attests that he was



a Lieutenant at PCI on May 26, 2011, when he was notified that Plaintiff had verbally refused a haircut and shave. Harouff attests that when he approached Plaintiff's cell and gave a directive for Plaintiff to come to the door, he saw that Plaintiff had his cell door covered, was yelling threats, and had a homemade knife. Harouff attests that a Force Cell Movement Team was assembled and Major Bush was notified. Harouff attests that an order was given to open Plaintiff's cell door, following which he administered a burst of chemical munitions into the cell since Plaintiff had presented a weapon. Bush also administered chemical munitions in an attempt to get Plaintiff to give up the knife and be restrained. Harouff attests that, following this incident, Plaintiff was seen by medical and allowed to decontaminate in his cell. Major Bush then authorized Plaintiff to be placed in the restraint chair. Harouff has attached a copy of his Incident Report relating to this incident to his affidavit as Exhibit A. Harouff attests that he also completed two reports on the Use of Force, which are attached to his affidavit as Exhibits B and C.

With respect to the second incident alleged in the Complaint, Harouff attests that on June 20, 2011 he was contacted by the SMU[5] Control Room Operator, Officer Eich, who advised him that an unknown item had been passed from a cell into the shower where Plaintiff was taking a shower. Harouff attests that he immediately instructed Corporal Root to close the wing door and exit all inmates from the showers on the other wings. Harouff attests that he, Root, and Sergeant Peay then entered the wing and directed Plaintiff to come to the door. Harouff attests that Plaintiff immediately threw an unknown substance at them, striking all three officers, following which he [Harouff] administered chemical munitions in the Plaintiff's direction. Harouff attests that Plaintiff again refused to come to the door and had what appeared to be a bottle in his hand, so he [Harouff]

---

[5]Special Management Unit.



administered a second burst of chemical munitions into the shower. However, Plaintiff still did not comply and still had the bottle in his right hand. Harouff attests that he gave Plaintiff another directive to relinquish the bottle, but that Plaintiff instead attempted to go to the back of the shower. Harouff attests that he then administered a third burst of chemical munitions into the shower, at which time Plaintiff complied with his directives and was restrained. Harouff attests that authorization was granted by Major Bush to place Plaintiff in the restraint chair, and that Plaintiff was secured in the restraint chair by Corporal Root and Officer McBride. Harouff attests that Plaintiff was also checked by medical and cleared. Harouff attests that a copy of his Incident Report relating to this incident is attached to his affidavit as Exhibit D, and that he also completed two reports on the Use of Force, copies of which are attached to his affidavit as Exhibits E and F. See generally, Harouff Affidavit, with attached Exhibits.

       The Defendants have also submitted an affidavit from Lt. Dwayne Monroe, who attests that he is a Lieutenant at PCI. Monroe attests that on May 26, 2011, Plaintiff had his cell door covered with a sheet and mattress and refused to uncover the door and be cuffed. Monroe attests that he had a 36 inch baton and that he struck the center of the mattress approximately ten times before Plaintiff backed off the door. Monroe attests that he then noticed a homemade knife in Plaintiff's right hand, and that Plaintiff came up and stabbed the door shield where Monroe was several times. Monroe attests that Plaintiff's homemade knife was a white metal weapon with a sharp point approximately eight inches long, which he had made from a piece of metal in his cell. Monroe attests that he operated the camera during the extraction of Plaintiff from his cell, and that a copy of his Incident Report relating to this incident is attached to his affidavit as Exhibit A, while a copy of his report on the Use of Force is attached to his affidavit as Exhibit B. See generally, Monroe



<u>Affidavit</u>, with attached Exhibits.

The Defendants have also submitted an affidavit from Officer D. Nalley, who attests that he is a correctional officer at PCI. Nalley attests that on May 26, 2011 he assisted in the removal of Plaintiff from the restraint chair at approximately 7:30 p.m. Nalley attests that a copy of his report on the Use of Force is attached to his affidavit as Exhibit A. <u>See generally</u>, <u>Nalley Affidavit</u>, with attached Exhibits.

The Defendant Dennis Arrowood has submitted an affidavit wherein he attests that he is a Sergeant assigned to PCI, and that on May 26, 2011 he secured Plaintiff into a restraint chair. Arrowood attests that he also subsequently assisted Corporal Root in removing the Plaintiff from the restraint chair. Arrowood has attached a copy of his Incident Report relating to this matter to his affidavit as Exhibit A, and a copy of his report on the Use of Force as Exhibit B. <u>See generally</u>, <u>Arrowood Affidavit</u>, with attached Exhibits.

The Defendants have also submitted an affidavit from R. Root, who attests that he is a Corporal at PCI, and that on May 26, 2011 he assisted in placing Plaintiff into a restraint chair. He also assisted Sgt. Arrowood in removing Plaintiff from the restraint chair. Root attests that a copy of his Incident Report relating to this matter is attached to his affidavit as Exhibit A, while a copy of his report on the Use of Force is attached as Exhibit B.

With respect to the incident of June 20, 2011, Root attests that he was advised by the Control Room Officer that something was being passed between cells to the shower where Plaintiff was, and that he observed string going back under a cell door. Root attests that he immediately notified Lieutenant Harouff and an officer was posted at the wing door. Root attests that he then gave verbal instruction to the Plaintiff to back up to the door and put his hands through the flap to



be cuffed, at which time Plaintiff proceeded to throw a liquid substance which appeared to contain feces on to himself, Sgt. Peay, and Officer McBride.  Root attests that Harouff then administered a burst of chemical munitions to prevent Plaintiff from further assaulting the officers, but that Plaintiff still refused to come to the door to be cuffed.  As a result, another burst of chemical munitions was administered by Harouff, following which Plaintiff again refused the same directive to come to the flap to be cuffed.  Harouff then administered a third burst of chemical munitions, at which time Plaintiff finally complied.  Harouff attests that Plaintiff was restrained and immediately placed into the restraint chair per the authority of Major Bush.  Root attests that Plaintiff was also evaluated by medical following this incident.  Root attests that he assisted placing Plaintiff in the restraint chair, and that at approximately 3:30 he also assisted Sergeant Arrowood in removing Plaintiff from the restraint chair to allow him to walk around and use the restroom.  Plaintiff was then placed back into the restraint chair.  Root has attached a copy of his Incident Report relating to this incident to his affidavit as Exhibit C, as well as a copy of his report on the Use of Force as Exhibit D.  See generally, Root Affidavit, with attached Exhibits.

The Defendants have also submitted an affidavit from Sergeant Peay, who attests that he is a Sergeant at PCI and that on June 20, 2011 was called to the SMU to help get Plaintiff out of the shower.  Peay attests that he observed Plaintiff throwing an unknown substance from the shower onto Corporal Root and himself.  Peay attests that following this incident, Plaintiff was placed in a restraint chair, and that a copy of his Incident Report relating to this matter is attached to his affidavit as Exhibit A.  Peay further attests that he was later on the shield to help pull Plaintiff from the restraint chair to use the bathroom, following which Plaintiff was placed back into the restraint chair.  Peay has attached a copy of his Incident Report relating to this matter to his affidavit as Exhibit B.



See generally, Peay Affidavit, with attached Exhibits.

The Defendants have also submitted an affidavit from Officer J. Browning, who attests that he is a correctional officer assigned to PCI, and that on June 20, 2011 he observed Corporal Root give Plaintiff an order to come to the shower door to be restrained. Browning attests that Plaintiff then threw an unknown substance onto Root, Peay and McBride, following which Harouff administered a short burst of chemical munitions and gave Plaintiff another directive to come to the door to be restrained. Browning attests that Plaintiff again refused, and a second burst of chemical munitions was then administered by Harouff, following which Plaintiff was given another directive to come to the door to be restrained. Browning attests that Plaintiff again refused, and a third burst of chemical munitions was administered by Harouff, at which time Plaintiff finally complied with directives to be restrained. Browning attests that Major Bush gave permission to place Plaintiff in the restraint chair, and that Plaintiff was also seen by medical. Browning attests that he completed two Incident Reports relating to this matter, copies of which are attached to his affidavit as Exhibits A and B. See generally, Browning Affidavit, with attached Exhibits.

The Defendant Cathy Jones has submitted an affidavit wherein she attests that she is a licensed practical nurse employed by the SCDC, and assigned to PCI. Nurse Jones attests that she is familiar with the Plaintiff, and that she has also reviewed Plaintiff's medical encounters from May 26, 2011, copies of which are attached to her affidavit as Exhibit A. Nurse Jones attests that, pursuant to policy and procedure, she examined Plaintiff at approximately 3:30 p.m. on May 26, 2011, when he was initially released from the restraint chair, and found both his radial and pedal pulses to be strong and his hands and feet warm to the touch. Nurse Jones attests that, pursuant to policy and procedure she again observed Plaintiff at approximately 8:00 p.m. when he was released



from the restraint chair and returned to his cell. Nurse Jones attests that Plaintiff refused to answer any of her questions at that time, but did not appear to be in any distress. See generally, Jones Affidavit, with attached Exhibit [SCDC Health Services Medical Summaries].

Finally, the Defendants have also submitted an affidavit from Victoria Balogun, who attests that she is a registered nurse employed by the SCDC. Nurse Balogun attests that on May 26, 2011 she was assigned to PCI. Nurse Balogun attests that she has reviewed Plaintiff's medical encounter records from May 26, 2011, which are attached to her affidavit as Exhibit A, and that these records reflect that Plaintiff was brought to medical following the use of force on May 26, 2011, where she examined the Plaintiff and treated a wound to his forehead. Nurse Balogun attests that she does not recall Plaintiff informing her that his skin and eyes were irritated from the chemical munitions, and that she noted no shortness of breath or acute distress. Nurse Balogun attests that when an inmate comes to medical following the use of chemical munitions, standard procedure is to recommend that the inmate use the water in his or her cell to rinse off until they feel comfortable. Nurse Balogun attests that she did not deny Plaintiff adequate medical care as alleged in his Complaint. See generally, Balogun Affidavit, with attached Exhibits.

In opposition to the Defendants' summary judgment motion, Plaintiff has filed a sworn statement (Court Docket No. 63) in which he states that on June 20, 2011 he was sprayed by Harouff with 239.6 grams of a chemical agent while confined in a shower stall after having thrown fecal matter on corrections officers. Plaintiff states that after having been sprayed with gas the first time and being told to put his hands through the flap to be cuffed, he complied. However, Plaintiff states that even though his hands were through the flap, Harouff and other officers kept yelling at him to put his hands through the flap, and that Harouff continued "gassing" him. Plaintiff states that



he was "nude and burning from the effects of all the gas".  Plaintiff states that "at one time Lt. Harouff sprayed what seemed an entire can of gas" at point blank range, and that it was when he "started to fall forward" that he was finally cuffed.  Plaintiff states that he was then placed in the restraint chair, and that although he asked to "wash the gas off", he was "ignored".  Plaintiff also states that he asked Lt. Harouff to let him use the cell sink in order to remove some of the gas from his face, but he said "no", as did Corp. Root and Sgt. Arrowood.  Plaintiff states that he became frustrated and told them to "get the f . . . out of the cell because they refused to allow me to decontaminate".  Plaintiff concedes that he was seen by the nurse, however, both when he was placed in the chair and when he was removed.  Plaintiff further states that the officers were disrespectful to him.  Plaintiff states that after he was released from the restraint chair he was still not allowed to shower for 72 hours because the next scheduled SMU showers were not until Monday, although he did try to remove some of the gas residue with water from the toilet.  See generally, Plaintiff's Sworn Statement.

As attachments to his response to the Defendants' motion for summary judgment, Plaintiff has submitted many of the same exhibits submitted by the Defendants, in particular the filed reports on the Use of Force.  Plaintiff has also submitted a copy of what purports to be the SCDC policy on the use of force, on which he has underlined statements therein as follows: "Physical force will never be used as a punishment"; "Physical force may be used only when all other means are determined to be ineffective or inappropriate"; and "Physical force may be used only in cases of self-defense, to prevent self-injury, protection of others, prevent escapes, or to enforce a lawful order".  Plaintiff has also submitted as his "Exhibit B" what purports to be some sort of a time line, although the source of this document is unclear.  Plaintiff has also submitted copies of some of the



13

Defendants' responses to his discovery requests and requests for admissions, as well as some grievance documents.

Finally, Plaintiff has submitted a sworn statement from fellow inmate Anthony Mann, who states that he witnessed the incident that transpired in the "Z-wing shower" on June 20, 2011. Mann states that he witnessed what occurred while in his bed in his cell. Mann states that he observed Corporal Root instructing Plaintiff to exit the Z-wing shower, and that he also observed Root and Sgt. Peay spray chemical munitions into the shower on the Plaintiff, who had his back turned to them. Mann states that Sgt. Peay also grabbed a plexiglass door shield from next to his cell door and placed it over the shower door, thereby "trapping the chemical munitions inside the shower with Plaintiff". Mann states that Root continued spraying Plaintiff through a slot in the center of the shield, with Lt. Harouff taking over holding the shield while Root and Peay went to get gas masks because of the gaseous fumes. Mann attests that he observed Lt. Harouff shaking his gas can while holding the shield up with his left. Mann states that he heard Harouff tell Plaintiff to "put you hands out of the flap . . . ." and that Plaintiff replied "my hands are out the flap". Mann states that he could see that Plaintiff's hands were out of the flap, but that Harouff sprayed a "prolonged burst" of chemical munitions onto the Plaintiff, following which he instructed Officer Browning to remove all of Plaintiff's property from his cell. Mann states that he then observed the officers take Plaintiff to his cell and secure him in a restraint chair, following which "Nurse Elmore" was brought to check Plaintiff's condition. Mann states that he overheard Plaintiff tell Nurse Elmore that the chains and cuffs on his wrists were too tight, but that Nurse Elmore stated there was nothing she could do about that. Mann states that Plaintiff spent ten hours in the restraint chair, during which he was checked at four hour intervals. Mann states that he did not observe Plaintiff being checked by medical



personnel, or given a shower or material to decontaminate himself.  Mann states that Plaintiff was not thereafter given an opportunity to shower for seven days.  <u>See generally</u>, <u>Mann Sworn Statement</u>.

In addition to the above, Plaintiff also refers the Court and the Defendants to exhibits he filed in an earlier lawsuit, <u>Al-Mujahidin v. Harouff, et al.</u>, Civil Action No. 9:11-2964, which was dismissed for failure of the Plaintiff to exhaust his administrative remedies.[6]  The undersigned has reviewed Plaintiff's response to the Defendants' motion for summary judgment in that other case, which contains the exhibits discussed below.

A "Declaration of Truth" was submitted from inmate Demetrius Jones, who states that he was in Cell D2-3 on May 26, 2011, which is the cell next door to the cell in which Plaintiff was placed in a restraint chair.  Jones states that he heard Plaintiff tell Sgt. Arrowood that he had blood on his face due to having been shot with a rubber bullet in the head, but that Arrowood did not acknowledge Plaintiff's request for medical attention.  Jones states that he then told Arrowood that Plaintiff needed medical attention, and that Arrowood told him to mind his own business.  Jones states that he later heard Plaintiff complain to officers that his cuffs were too tight and were cutting off the circulation to his hands, but that "no officer that was on shift acknowledged the situation in any way".  Jones states that the following day, May 27, 2011, he heard Plaintiff tell Nurse Lowery that he was having migraine headaches and had "blacked out" from the head injury, but that Nurse Lowery" told Plaintiff that she could not do anything for him because Sgt. Arrowood would not let her".  <u>See generally</u>, <u>Jones "Declaration of Truth"</u>.

Plaintiff also submitted a "Sworn Affidavit" from inmate Anthony Mann, who states

---

[6]<u>Aloe Creme Laboratories, Inc. v. Francine Co.</u>, 425 F.2d 1295, 1296 (5th Cir. 1970)[a federal court may take judicial notice of the contents of its own records].



that he was in his cell on Z-wing and awoke to his nose and throat burning and realized that someone was being "sprayed" with chemical munitions. Mann states that he looked through the window of his cell and witnessed a large amount of activity and guards running back and forth through the entrance to Y-wing, and that he could tell they were an "extraction team". Mann states that a few minutes later he "heard what sounded like gunfire, and that a couple of minutes after that he witnessed some officers carrying what appeared to be a "wounded prisoner" who had "blood pouring down his face". Mann states that he watched as this prisoner "was carried up towards the medical area . . . .". Mann states that approximately ten minutes later they brought the prisoner (who at that time he recognized as being the Plaintiff) to the cell next to him. Mann states that Plaintiff had a "huge band-aid" covering the left side of his forehead, and that he was placed in a restraint chair. Mann states that Plaintiff was in the chair for a total of eight hours, and that he did not witness Plaintiff being given a shower or any other means of decontamination. Mann states that Plaintiff still had blood running down the left side of his head and facial area. Mann states that at the conclusion of the eight hours in the restraint chair, Plaintiff was left in a strip cell per orders of Major Bush, and that he is not aware of Plaintiff being allowed a shower at that time or that any physical examination was done to assess his physical condition. However, Mann states that Nurse Jones was present and that she asked Plaintiff if he was having any problems and how he felt, but that when Plaintiff responded by describing a number of problems, Nurse Jones "walked away without any further assessment". Mann states that Plaintiff was not able to take a shower until the following Monday. See generally, Mann "Sworn Affidavit".

Mann also submitted an "Amended Affidavit" wherein he states that after Plaintiff was released from the restraint chair he informed "Nurse Jones" that he was having extreme



headaches and had been blacking out and was suffering from a "continuous ringing of his ears". Mann states that the following morning Plaintiff tried to explain his symptoms to "Nurse Lowery", who responded that the guards would not allow her to do anything to help him. Mann states that Nurse Jones then returned to the following day, May 28, but that when Plaintiff "described his issues again" Nurse Jones stated that she would not be allowed to see him. Mann also states that the light was left on in Plaintiff's room twenty-four hours a day. See generally, Mann Amended Affidavit.

Inmate Ronald Porterfield submitted a sworn statement in which he states that on the morning of May 26, 2011 he heard a "loud gunshot sound" that woke him up. Porterfield states that when he woke up he smelled "mace" gas. Porterfield states that his cell is on Z-wing, and that when he looked out of his cell window he saw an inmate "covered in blood" who was being pulled and dragged by correctional officers. Porterfield states that this same inmate was later brought back and placed in a cell in a restraint chair. Porterfield states that he could hear the inmate complaining to officers that he could not see because "mace gas was in his eyes and all over his body" and that he had been shot in the head and his head was hurting. Porterfield states that after the officers left the inmate "continued to scream that his entire body was burning he needed a shower to wash the gas mace off". Porterfield states that he began kicking on his room door to get the officers attention, and that when "Officer Browning" approached his cell he told him that "mace gas" was thick in the air and that Browning agreed to open the back door so that the dorm could air out. Porterfield states that when he told Browning that the inmate in the restraint chair needed medical attention, Browning responded that the inmate had already received medical treatment. Porterfield states that the inmate remained in the restraint chair for eight hours, and that the inmate complained that he had lost feeling in his hands from the handcuffs being too tight. Porterfield states that the medical nurses, including

17



Nurse Jones, refused to provide Plaintiff with a medical examination, and told the inmate to sign up for sick call which was scheduled for June 1, 2011. However, when Plaintiff turned in Staff Requests for sick call on June 1, 2011, he was denied medical treatment. See generally, Porterfield Affidavit.

Inmate John Smith has submitted an affidavit wherein he states that he was looking out of his cell room window on May 26, 2011 and observed "the Defendants bringing Plaintiff back from PCI Medical Services with blood dripping from under a round band-aid on his forehead . . . ." Smith states that Plaintiff was then placed in a restraint chair without having been provided with a shower even though he had been "gassed with all different chemical mace". Smith states that Harouff and Arrowood both ignored Plaintiff's request to be allowed to take a shower. Plaintiff remained in the restraint chair for eight hours. See generally, Jones Affidavit.

The Plaintiff also submitted an affidavit in which he states that on May 26, 2011 he was "placed in a restraint chair by Defendants D. Harouff and D. Arrowood per orders of D. Bush and M. McCall for 8 - 10 hrs." Plaintiff states that he was "covered" with chemical agents that had been sprayed on him by Bush and Harouff, and that even though he "begged and pleaded" with Harouff and Arrowood to take a shower, his pleas were "ignored". Plaintiff further states that Nurse Jones ignored his request that she recommend to the correctional officers that he be allowed to take a shower. Plaintiff states that he was not allowed to finally take a shower until Monday, May 30, 2011. See generally, Plaintiff's Affidavit.

Plaintiff also attached some exhibits to his response to the Defendants' motion for summary judgment in his previous case. These exhibits included some articles on restraint chairs and the effects of chemical agents. Plaintiff also submitted copies of some of the same SCDC Health

18



Services Medical Summaries as were submitted by the Defendants in the case at Bar, which include entries from June 20, 2011 showing that Plaintiff's handcuffs were "loosened and moved to a different position on [Plaintiff's] arm" after he complained, that the wrist area was assessed with no injury noted, and that Plaintiff "reported relief with handcuff being removed". The medical encounter notes provided by Plaintiff as an exhibit also include the entry note from May 26, 2011 where Plaintiff was noted to be walking in his room, that he had a band-aid on his forehead which was intact with no bleeding noted, and that he was observed walking over to a sink and washing his face.

Plaintiff's exhibits also include copies of some discovery responses he received from the Defendants in that case, some SCDC Management Information Notes, a copy of a Disciplinary Report and Hearing Record relating to the incident of May 26, 2011 and showing that Plaintiff was convicted of attempted assault and battery and for possession of a weapon, copies of an Incident Report, and copies of a handwritten time line of unknown origin. See Exhibits in Case No. 9:11-2964, Docket No. 70-2.

## Discussion

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d



872, 874-75 (4th Cir. 1992). Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990). Here, after careful review and consideration of the arguments and evidence presented, the undersigned finds and concludes as follows.

## I.

First, with respect to the Defendant South Carolina Department of Corrections, this Defendant is a state agency and is therefore immune from suit for damages in this Court by virtue of the Eleventh Amendment to the United States Constitution. Pennhurst State School and Hospital v. Halderman, 465 U.S. 89 (1984); Alden v. Maine, 527 U.S. 706 (1999); College Savs. Bank v. Florida Prepaid Educ. Expense Bd., 527 U.S. 666 (1999); College Savs. Bank v. Florida Prepaid Educ. Expense Bd., 527 U.S. 627 (1999); Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996); Alabama v. Pugh, 438 U.S. 781, 782 & nn. 1-2 (1978). The Eleventh Amendment also protects the SCDC from suit where injunctive relief is sought. Battle v. King, No. 12-2476, 2013 WL 5203650, at * 9 (D.S.C. Sept. 6, 2013); see also Seminole Tribe of Florida, 517 U.S. at 58. Further, this Defendant is not even a "person" subject to suit within the meaning of § 1983. Will v. Michigan Department of State Police, 491 U.S. 58, 64, 66 (1989); see also Coffin v. South Carolina Department of Social Services, 562 F.Supp. 579 (D.S.C. 1983).

While a state may waive its Eleventh Amendment immunity from suit in federal



court; <u>Pennhurst</u>, 465 U.S. at 99 & n. 9; the State of South Carolina has not done so.  To the contrary, as part of the enactment of the South Carolina Tort Claims Act, the South Carolina General Assembly expressly provided that the State of South Carolina does not waive Eleventh Amendment immunity, consents to suit only in a court of the State of South Carolina, and does not consent to suit in a federal court or in a court of another state.  <u>See</u> S.C. Code Ann. § 15-78-20(e); <u>see also</u> <u>McCall v. Batson</u>, 285 S.C. 243, 329 S.E.2d 741, 743 (1985) [Opinion abolishing sovereign immunity in tort "does not abolish the immunity which applies to all legislative, judicial and executive bodies and to public officials who are vested with discretionary authority, for actions taken in their official capacities."]. <u>Cf</u>. <u>Pennhurst</u>,  465 U.S. at 121 ["[N]either pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment."].

Hence, because the SCDC is a state agency and integral part of the state of South Carolina, it may not be sued in this Court by Plaintiff.  Accordingly, the SCDC is entitled to summary dismissal as a party Defendant in this case, even if this case is otherwise to proceed.[7]

## II.

### (Cell/Shower Extraction Excessive Force Claims)

When reviewing an excessive force claim, the Court should consider 1) the need for the application of force,  2) the relationship between the need and the amount of force that was used, 3) the threat to the staff and inmates as reasonably perceived by the prison officials on the basis of

---

[7]Similarly, Plaintiff's requested relief that this Court order that the Defendants Harouff and Arrowood be terminated from their jobs is also relief that may not be obtained through this lawsuit. <u>See</u> <u>Maxton v. Johnson</u>, 488 F.Supp. 1030, 1032, n. 2 (D.S.C. 1980), citing <u>United States v. White County Bridge Commission</u>, 275 F.2d 529, 535 (7th Cir.)[A federal district court lacks the inherent power to hire or remove officials not within the executive control of that federal district court], <u>cert. denied sub nomine</u>, <u>Clippinger v. United States</u>, 367 U.S. 818 (1960).



the facts known to them,  4) the efforts made to temper the severity of a forceful response, and 5) the extent of the injuries suffered by the prisoner.  Whitley v. Albers, 475 U.S. 312, 321 (1986); Hill v. Crum, 727 F.3d 312, 327 (4th Cir. 2013); see Mann v. Failey, 578 Fed.Appx. 267, 273 (4th Cir. July 17, 2014); Majette v. GEO Group, Inc., No. 07-591, 2010 WL 3743364, at * 6 (E.D.Va. Sept 22, 2010); see also Hudson v. McMillian, 503 U.S. 1, 7 (1992) [the core judicial inquiry is whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm]; Mann, 578 Fed.Appx. 273 [In order to prevail on an Eighth Amendment excessive force claim, Plaintiff must show both that the deprivation suffered or injury inflicted was sufficiently serious, and that the prison official acted with a sufficiently culpable state of mind], citing Williams v. Benjamin, 77 F.3 756, 761 (4th Cir. 1996).

        **May 26, 2011 Incident**.  With respect to the incident of May 26, 2011, the Defendants have submitted substantial testimonial and documentary evidence showing that at the time force was used, Plaintiff had barricaded himself in his cell, had a weapon (an eight inch long knife), and was threatening correctional staff.  Defendants' evidence further reflects that Plaintiff had stabbed the protective shield separating him from the officers several times with the knife , and was refusing to obey the corrections officers' instructions and allow himself to be handcuffed and restrained.  The Defendants certainly would have reasonably perceived a threat based on these facts, as well as a need for the application of force to get the situation under control.  It is simply a truism that when prison inmates are non-compliant with legitimate instructions and prison requirements, physical force sometimes has to be applied in order to gain compliance and maintain institutional security, the security of prison employees, as well as the inmates themselves.  It is only when the force used under such circumstances is constitutionally excessive that a viable § 1983 claim is



presented.

After careful review and consideration of the evidence, the undersigned does not find an issue of fact sufficient to go to a jury as to whether constitutionally excessive force was used in this incident under the standards of <u>Whitley</u>. Plaintiff's evidence does not even contest the Defendants' evidence concerning his conduct or the fact that he was brandishing a knife at the time in question. While Plaintiff does complain about being sprayed with "in excess of 275 grams[8] of an unknown chemical" during this altercation, the use of mace or pepper spray by prison officials is not a violation of a prisoner's constitutional rights when used appropriately. <u>Williams</u>, 77 F.3d 763; <u>Peterson v. Davis</u>, 551 F.Supp. 137 (D.Md. 1982), <u>aff'd</u> without op., 729 F.2d 1453 (4th Cir. 1984); <u>Williams v. Dehay</u>, Nos. 94-7114, 94-7115, 1996 WL 128422 **2-3 (4th Cir. March 21, 1996). Indeed, chemical sprays are generally used in order to *avoid* having to use direct physical force, or in an attempt to lessen the amount of physical force necessary. <u>cf</u>. <u>Whitmore v. Walker</u>, No. 04-837, 2009 WL 900034 at * 9 (S.D.Ill. Mar. 27, 2009) ["[E]ighth Amendment does not require prison guards to engage in physical struggle with an inmate before using chemical mace. Indeed, part of the rationale for using mace is to allow the guards to avoid engaging in physical altercations with an inmate."].[9] Prisons are dangerous places, and prison officials are entitled to take necessary

---

[8]Defendants' evidence confirms that this was the approximate amount of chemical munitions used. <u>See</u> <u>Harouff Affidavit</u>, attached Exhibit C, p. 4.

[9]That was certainly the case during this incident. The undersigned is aware of no <u>per se</u> rule for finding excessive force based on the amount of chemical munitions used, and while concerned about the amount of munitions sprayed in this incident, which might under other circumstances support a finding of excessive force; <u>cf</u>. <u>Wright v. Mack</u>, No. 12-2232, 2013 WL 3946286, * 2 and nn. 2 & 3 (D.S.C. July 31, 2013); no correctional officer would have reasonably wanted to risk being stabbed by a belligerent inmate brandishing an eight inch long knife. To the contrary, the use of every option possible to gain Plaintiff's compliance without having to use direct physical force,
(continued...)



precautions to protect themselves from risk of harm and injury at the hands of inmates, in particular high security inmates.

Here, the evidence shows that a chemical agent was used in an attempt to obtain compliance from the Plaintiff in the first instance so that no physical force would have to be used, which of course was ultimately the case. See Grissom v. Roberts, No. 09-3128, 2009 WL 2601260 at * 6 (D.Kan. Aug. 24, 2009)[Finding that under the circumstances, which included Plaintiff refusing to obey orders, Plaintiff failed to show that the use of physical force including pepper spray was repugnant to the conscience of mankind].  The evidence before the Court clearly shows a need for the application of force under the circumstances, and that the extent of force used was in order to diffuse the situation, gain Plaintiff's compliance, and minimize the risk of injury to both Plaintiff and the prison guards as a result of a physical confrontation brought about by Plaintiff's own conduct.  Additionally, there is no evidence to show that, once Plaintiff stopped resisting and was taken into custody, any further physical force was used against him.  Wilson v. Flynn, 429 F.3d 465, 469 (4th Cir. 2005)[Lack of evidence that officers used any improper force after restraining a prisoner "distinguishes [Plaintiff's] case from many in which we have held the Plaintiff has alleged an excessive force claim."]; cf. Mann, 578 Fed.Appx. 274-275 [Noting that where evidence showed officers continued to apply force against inmate "well after he had ceased his resistance", claim could

---

[9](...continued)

during which both the officers and the inmate would have run the risk of serious injury, was a reasonable course of action.  Here, the amount of chemical agent deployed along with use of a 37 mm resulted in no direct physical altercation between Plaintiff and staff being required to get control of what was a highly volatile and dangerous situation.  See also, Bailey v. Turner, 736 F.2d 963, 969 (4th Cir. 1984) [In determining whether the amount of force used was reasonable, courts should evaluate the "totality of the circumstances, including the provocation, the amount of gas used, and the purposes for which the gas is used (to) determine the validity of the use . . . ."].



proceed]; Williams, 77 F.3d 761 [because prison officials are entitled to use appropriate force to quell prison disturbances, and because these officials oftentimes must act under pressure without the luxury of a second chance, in order for a prisoner to prevail on an Eighth Amendment claim he must demonstrate that officials applied force maliciously and sadistically for the very purpose of causing harm]. Plaintiff has also failed to show that he suffered any significant injury as a result of this incident.[10]

Therefore, the evidence does not show that the amount of force that was used exceeded the requirements necessary to gain control of the situation. See Whitley, 475 U.S. at 321 [discussing five factors to consider when evaluating an excessive or claim]. Plaintiff, a high security inmate, was engaging in violent and dangerous behavior during the incident at issue, and no genuine issue of fact is presented in the evidence that Plaintiff's constitutional rights were violated while he was having to be taken into custody during this incident. Hudson, 503 U.S. at 7 [the core judicial

---

[10]The only actual injury reflected in the medical evidence is that Plaintiff sustained a minor laceration on his forehead. See Jones Affidavit, attached Medical Summaries. Although it is not required that Plaintiff show he suffered more than a de minimis injury to maintain an excessive force claim; see Wilkins v. Gaddy, 130 S.Ct. 1175, 1179-1180 (2010)[Noting that the notion that significant injury is a threshold requirement for stating an excessive force claim was rejected in Hudson, 503 U.S. at 7]; the extent of any injury suffered by an inmate remains a factor to be considered under Whitley in evaluating an excessive force claim, and the "absence of [a] serious injury" remains relevant in an Eighth Amendment inquiry. Wilkins, 130 S.Ct. at 1179-1180 [holding that the extent of injury may provide some indication of the amount of force applied, and stating that "[a]n inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim"], citing to Hudson, 503 U.S. at 9 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)); see also Ellerbe v. Roach, No. 08-3118, 2010 WL 3361703, at * 3 (E.D.N.C. Aug 24, 2010); Mann, 578 Fed.Appx. 272 [Noting that "a lack of injury is not dispositive, so long as there is sufficient evidence of maliciously - applied force"] (emphasis added). Plaintiff has failed to produce any evidence showing he suffered any significant injury as a result of this incident. See Strickler v. Waters, 989 F.2d 1375, 1380-1381 n. 9 (4th Cir. 1993) [the mere incantation of physical or mental injury is inadequate to survive a motion for summary judgment]; House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [Plaintiff's conclusory allegations insufficient to maintain claim].



inquiry is whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm]; Bell v. Wolfish, 441 U.S. 520, 540 (1979) ["[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action"]; see also Johnson, 481 F.2d at 1033 ["not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"]. Whitley, 475 U.S. at 321 [Conduct only actionable where evidence shows it was taken "in bad faith and for no legitimate purpose"]; Bailey, 736 F.2d at 969 [Courts must evaluate the "totality of the circumstances, including the provocation, the amount of gas used, and the purposes for which the gas is used [to] determin[e] the validity of the use . . . in the prison environment"].

  While Plaintiff may conceivably have a state law claim he could assert arising from this incident, or some further administrative remedy he can pursue, the evidence before this Court is not sufficient to create a genuine issue of fact as to whether *constitutionally* excessive force was used under the circumstances in this case. Grissom, 2009 WL 2601260, * 6 ["Not every isolated battery or injury to an inmate amounts to a federal constitutional violation"]; see Paul v. Davis, 424 U.S. 693, 701 (1976) [not every claim which may set forth a cause of action under a state tort law is sufficient to set forth a claim for a violation of a constitutional right]; DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 200-203 (1989) [§ 1983 does not impose liability for violations of duties of care arising under state law]; Baker v. McClellan, 443 U.S. 137, 146 (1976) [§ 1983 claim does not lie for violation of state law duty of care]. Therefore, the Defendants are entitled to dismissal of Plaintiff's excessive force claim with respect to having been taken into custody on May 26, 2011.

  **June 20, 2011 Incident**. With respect to the incident of June 20, 2011, Plaintiff



alleges in his verified Complaint that while confined in the shower, he was "sprayed with an entire can of mace by Def. Harouff for no apparent reason".  No further information concerning this incident is set forth in the Complaint.  However, the Defendants have submitted both documentary and testimonial evidence showing that this incident began when correctional staff obtained information that an unknown item had been passed from a cell to the shower where Plaintiff was located, and that when correctional staff entered the wing and directed Plaintiff to come to the door, Plaintiff threw an unknown substance (believed to contain, among possible other substances, fecal matter) on the correctional officers while refusing to come to the door and be cuffed.  Plaintiff then remained in the shower refusing to come to the door while holding what appeared to be a bottle in his hand, during which three separate burst of chemical munitions were sprayed into the shower.[11]  According to the Defendants' evidence, after each of the first two bursts Plaintiff was instructed to come to the door and be cuffed and refused, but after the third spray of a chemical munition into the shower, Plaintiff came forward and was taken into custody without incident.  Therefore, as was the case with respect to the incident of May 26th, the Defendants' evidence shows that the use of a chemical agent resulted in no direct physical struggle between Plaintiff and correctional officers being required.  Cf. Whitmore, 2009 WL 900034 at * 9 ["[E]ighth Amendment does not require prison guards to engage in physical struggle with an inmate before using chemical mace.  Indeed, part of the rationale for using mace is to allow the guards to avoid engaging in physical altercations with an inmate."].

      Much of the Defendants' evidence discussed hereinabove is not disputed.  In his

---

[11]The evidence shows that the first burst was 76.7 grams.  The second burst was 95.9, and third was 67.0, for a total of 239.6 grams.  Harouff Affidavit, attached Exhibit D.



sworn statement addressing this incident Plaintiff admits to having thrown fecal matter on the officers, while he does not address the Defendants' evidence that he had a bottle in his hand and does not dispute that he did not come forward to be cuffed until gas was administered into the shower. However, Plaintiff contends that more gas was used than necessary, and specifically attests that Harouff continued to "gas" him even after he had stopped resisting and come forward to put his hands through the flap, with Harouff at that point spraying "what seemed [like] an entire can of gas" on him at "point blank range." Plaintiff's version of events is supported by Mann, who attests in his affidavit that Harouff sprayed a "prolonged burst" of chemical munitions on to the Plaintiff even though he could see that Plaintiff had his hands outside of the flaps.

There is no evidence to show (and indeed Plaintiff does not even allege) that after he was cuffed and taken into custody, there was any additional physical force used against him. Therefore, this case is not similar to the facts found in <u>Mann</u>, where the evidence showed that officers continued to beat and choke the Plaintiff even after he had been wrestled to the floor and placed in restraints and ceased his resistence. <u>Mann</u>, 578 Fed.Appx. 274-275; <u>see</u> <u>Hudson</u>, 503 U.S. at 7 [the core judicial inquiry is whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm]. However, while this incident mirrors many of the facts surrounding the incident of May 26th, it differs insofar as Plaintiff and Mann both attest that Harouff continued to spray Plaintiff with chemicals even after he had already stopped resisting and placed his hands in the door flaps. The Fourth Circuit in <u>Mann</u> held that "[g]iven the affidavits, both from Mann and other inmates, that he shouted multiple times that he was 'not resisting'", a jury could infer that the officers "wantonly administered serious force to Mann in retaliation for his conduct rather than for the purpose of bringing him under control . . .;" <u>Mann</u>, 578



Fed. Appx. At 274-275; and that therefore summary judgment should have been denied. Plaintiff's and Mann's statements in their affidavits, considered to be true for purposes of summary judgment, appear to meet this threshold here. See Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) [At summary judgment, courts are to accept an inmates's version of all that is in dispute]; Whitley, 475 U.S. at 321 [Conduct may be actionable where evidence shows it was taken "in bad faith and for no legitimate purpose"]; Mann, 578 Fed.Appx. at 274-275 [Noting that where evidence showed officers continued to apply force against inmate "well after he had ceased his resistance", claim could proceed].

Therefore, Plaintiff's excessive force claim relating to his having been taken into custody on June 20, 2011 is not subject to summary judgment. However, as the Defendant Harouff is the only Defendant who Plaintiff's evidence shows was involved in the allegedly excessive spraying of chemical munitions, the remainder of the Defendants are entitled to summary judgment on this claim. Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) [Plaintiff must affirmatively show that the defendant "had personal knowledge and involvement in the alleged deprivation" of plaintiff's constitutional rights] (citing Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977)).

### III.

### (Cleansing of Chemical Munitions)

Plaintiff also alleges in his Complaint that following the May 26, 2011 incident he was "denied an opportunity to shower and remove chemical agent (mace) which was burning his skin for a period of 7-10 days". Plaintiff further alleges that Bush and McCall instructed Arrowood and Harouff to "turn off the water in his cell after he was removed from the restraint chair", and that the Defendant Nurse Jones refused to instruct the Defendants to allow him to shower to remove the



mace from his skin.  Similarly, with respect to the incident of June 20, 2011, Plaintiff alleges that following this incident he was "placed nude in the restraint chair and not allowed to remove chemical agent in spite of his pleading with defs. Harouff and Arrowood that he be allowed to shower . . . ."

Denial of decontamination can give rise to an Eighth Amendment claim.  <u>Williams</u>, 77 F.3d at 768; <u>Mann</u>, 578 Fed. Appx. at 273.  However, to survive summary judgment, Plaintiff must do more than simply allege he was not allowed to sufficiently decontaminate.  Rather, Plaintiff must have *evidence* to support his claim that he was in such a state that the extent of decontamination he desired (a shower) was what was required, and that the officers' treatment of him under the circumstances was a violation of his constitutional rights.  <u>Morgan v. Church's Fried Chicken</u>, 829 F.2d 10, 12 (6th Cir. 1987) ["Even though <u>pro</u> <u>se</u> litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]; <u>cf.</u> <u>Mann</u>, 578 Fed.Appx. 274-275 [In order to avoid summary judgment Plaintiff must have evidence to show the Defendant officers "wantonly denied [Plaintiff's] repeated requests to wash off the painful effects of pepper spray before confining him with four-point restraints . . . ."].  Plaintiff has failed to meet this standard with respect to this claim.

Plaintiff states in his affidavit that when he was placed in the restraint chair following the incident of May 26, 2011, he was "covered" with chemical agents, but that his repeated requests to the correctional officers and to Nurse Jones to be allowed to take a shower were "ignored". Defendants are not contesting that Plaintiff was not allowed a shower.  However, Plaintiff has himself provided medical evidence which contradicts his conclusory allegations of being "covered" with "burning" chemical agents, as one of his own exhibits (a copy of his medical records from that



day) notes, among other entries, that Plaintiff had been examined and was in no distress and was even observed washing his face in a sink. <u>Cf</u>. <u>Bickerstaff v. Vassar College</u>, 196 F.3d 435, 455 (2d Cir. 1999) [a party may not create an issue of fact by submitting contradictory evidence and testimony.] (internal quotations and citations omitted).[12]  Plaintiff's other evidence consists of a statement from inmate Mann, who saw the Plaintiff following the incident of May 26,2011, in which Mann says that he did not witness Plaintiff ever being provided with a shower, as well as statements from inmates Porterfield and Jones, both of whom confirm that a chemical agent had been used and that Plaintiff was complaining that he needed to shower but was not allowed to.  Again, however, there is no dispute that Plaintiff was subjected to a chemical agent (which is not <u>per se</u> unconstitutional), and Defendants are not contesting that he was not allowed to take a shower.  As such, although these statements by Plaintiff and the other inmates are assumed to be true for purposes of summary judgment, they do not in and of themselves establish a constitution violation.

As for the incident of June 20, 2011, Plaintiff states in his "sworn statement" that after being sprayed with gas "at point blank range", he was placed in the restraint chair without being allowed to wash off; not even being allowed to use a sink.  Plaintiff does acknowledge, however, that he was seen by a nurse when he was placed in the restraint chair.  Inmate Mann has also submitted an affidavit about this incident in which he attests that he did not observe Plaintiff being allowed a shower or decontaminate himself.  However, Mann does acknowledge that Plaintiff was checked by a nurse when he was placed in the restraint chair, and he does not know what may have occurred

_____

[12]Similarly, while Plaintiff alleges in his verified Complaint that he was not allowed to shower for "seven to ten days", in his affidavit he says he was allowed a shower on May 30th. <u>Kennedy v. Allied Mutual Ins. Co.</u>, 952 F.2d 262, 266 (9th Cir. 1991) [party cannot create issue of fact by contradicting prior testimony].



when he was not able to observe the Plaintiff.

       In contrast to the relative paucity of evidence from the Plaintiff in support of his claim that he was still suffering from the effects of chemical munitions when he was placed in restraints, the Defendants have submitted substantial testimonial and documentary evidence to show that no constitutional violation occurred.  Bush attests that following both the incident of May 26, 2011 and the incident of June 20, 2011, Plaintiff was seen and cleared by medical before being placed in the restraint chair.  Bush Affidavit, ¶¶ 6, 9.  The Incident Report from the incident of May 26, 2011 also reflects that after Plaintiff was restrained he was "seen by Nurse Jones", while the SCDC display minute narratives reflect that after the June 20, 2011 incident Plaintiff was "evaluated by medical and placed on a 15 minute observation".  Bush Affidavit, attached Exhibits A and B.  Harouff attests in his affidavit that following the incident of May 26, 2011, "Plaintiff was seen by medical and allowed to decontaminate in his cell", and that following the June 20, 2011 incident "Plaintiff was checked by medical and cleared".  Harouff Affidavit, ¶ ¶ 4, 10.  Further, Harouff's Incident Report for the May 26, 2011 incident states that at the conclusion of this incident "I/M afforded medical & decom[tamination]", while the reports on Use of Force both reflect that at the conclusion of this incident "medical evaluated I/M" as well as that "medical arrived after the I/M was placed in the chair, and was cleared".  Harouff Affidavit, attached Exhibits A, B, C.  Similarly, the Incident Report for the June 20, 2011 incident reflects that at the conclusion of that incident "I/M checked by medical and cleared", while the reports on the Use of Force both reflect that following this incident "I/M evaluated by medical" and "I/M checked by medical; placed on 15 min watch".  Harouff Affidavit, attached Exhibits D, E, F.

       Root also attests in his affidavit that following the June 20, 2011 incident, "Plaintiff



was evaluated by medical following the incident", while his Incident Report reflects that "I/M . . . was evaluated by medical". His reports on the Use of Force state that Plaintiff was "evaluated by medical (Nurse Chase)" at 11:30 a.m. and was "evaluated by medical (Nurse Elmore)" at 5:30 p.m. Root Affidavit, attached Exhibits B, C, D. Browning also attests that following the June 20, 2011 incident, "Plaintiff was seen by medical"; Browning Affidavit, ¶ 5; while his incident report states that "I/M . . . was seen by medical". Browning Affidavit, attached Exhibit A. With respect to the May 26, 2011 incident, Nurse Jones attests that she saw Plaintiff twice while in the restraint chair, and that Plaintiff "did not appear to be in any distress". Jones Affidavit, ¶ ¶ 4, 5.

Additionally, the SCDC Health Services Medical Summaries reflect that Plaintiff was "brought to medical after chemical munition applied to him by officer" on May 26, 2011, that he had a wound on his head cleaned and dressing applied, and that Plaintiff was in no other difficulty. The Health Services Medical Summaries also reflect that Nurse Jones saw Plaintiff twice more on May 26, 2011, with one of these entries stating that when Nurse Jones arrived Plaintiff was "walking in room", and that when she asked him if he was okay he "Did not reply. Band-aid on forehead intact no bleeding noted . . . . when asked about wrist inmate walked over to sink and began washing his face again did not respond to nurse's question". Jones Affidavit, attached Exhibit [Medical Summaries notes]. As for the incident of June 20, 2011, the Health Services Medical Summaries reflect that Plaintiff was "placed in restraint chair due to dashing officers with feces. Chemical munitions were also used. I/M would not respond to questions by this nurse. Plaintiff's skin was noted to be warm and dry, with no distress noted." A subsequent report from that same date reads: "Inmate assessed for post-dash exposure to OC gas. Inmate sitting calmly in chair with hands in lap with handcuffs and leg irons in place. Inmate reports he has injury to right wrist." This entry



concludes by noting that in response to Plaintiff's complaint, his handcuffs were loosened and moved to a different position on his arm, and that there were no further problems noted.  See Balogun Affidavit, attached Exhibit [Health Services Medical Summaries].

After careful review and consideration of the evidence before this Court, the undersigned does not find that a genuine issue of fact is presented in the evidence as to whether Plaintiff's Eighth Amendment rights were violated due to any failure to allow him to wash off chemical munitions to which he may have been subjected.  Plaintiff's evidence confirms that he was subjected to chemical spray on both occasions, and the undersigned has assumed to be true his affidavit evidence that he was not allowed a shower after either incident even though he was complaining about still having residue on him and that he wanted to take a shower.  However, while the undersigned has assumed these factual assertions to be true for purposes of summary judgment, they are alone not sufficient to allow this claim to proceed, for if they were, then all any inmate would ever need to do to avoid summary judgment or such a claim would be to conclusorily allege that he was not allowed to properly decontaminate after being subjected to a chemical spray.  House, 824 F.Supp. at 485 [Plaintiff's conclusory allegations insufficient to maintain claim]; Nat'l Enters., Inc. v. Barnes, 201 F.3d 331, 335 (4th Cir. 2000)[Holding that a self-serving affidavit was insufficient to survive summary judgment]; see also Strickler, 989 F.2d at 1380-1381 n. 9 [the mere incantation of physical or mental injury is inadequate to survive a motion for summary judgment]. Rather, Plaintiff must have actual evidence to support such a claim in order to survive summary judgment.  Stanley v. Hejirika, 134 F.3d 625, 634 (4th Cir. 1998) ["[A] court may allow an inmate's claim to go to the jury only if it concludes that the evidence, viewed in the light most favorable to the claimant, will support a reliable inference of wantonness in the infliction of pain"] (internal

34



quotation marks omitted).

The Defendants have submitted documentary evidence (all of which was completed contemporaneously with the events at issue, well before any lawsuit containing claims concerning these events was filed, and not in response to Plaintiff's claims) showing that Plaintiff received medical attention immediately after both incidents and that he was not having any difficulties with respect to having been subjected to any chemical munitions. Significantly, Plaintiff's own affidavits and exhibits also confirm that he was seen and cleared by medical personnel following both of these incidents. Further, the actual Health Services Medical Summaries, which document Plaintiff's medical care (and which Plaintiff has himself submitted as exhibits in this case), reflect that Plaintiff's only injury following the May 26, 2011 incident was a laceration to his forehead, which was cleaned and dressed when he was taken to medical following the incident with Plaintiff exhibiting no other difficulties, and that he was even observed that day by the nurse walking over to a sink and washing his face. Additionally, the Medical Summary entry following the June 20, 2011 incident reflects that, following this incident, Plaintiff was "Assessed for post-exposure to OC gas. Inmate sitting calmly in chair with hands in lap with handcuff and leg irons in place", and that his only complaint was with regard to some edema on his right wrist around the handcuffs, for which he was again seen by medical personnel.

These facts are not similar to the situation present in <u>Mann</u>,[13] in which a claim relating to deprivation of decontamination was allowed to proceed where the Plaintiff had supported his claims with more than fifty exhibits documenting that he was wantonly not allowed to wash off

---

[13]Interestingly, the Anthony Mann who was the Plaintiff in <u>Mann v. Failey</u> appears to be the same Anthony Mann who has submitted three (3) affidavits in support of the Plaintiff here.



chemical residue as punishment by prison officials, with the Defendants in that case not even offering any evidence to refute Plaintiff's contention that he was not permitted to wash off chemical munitions prior to being placed into a restraint chair. See Mann v. Failey, Civil Action No. 0:11-2232 (D.S.C.), Docket No. 180, pp. 20-21.[14] The Fourth Circuit in Mann held that there was "ample evidence from which a fact finder could find that [Defendants] acted maliciously, sadistically, and in violation of the Eighth Amendment" with respect to Mann's failure to decontaminate claim because the officers not only did not permit Plaintiff to decontaminate, but no medical personnel checked on his condition, and the Defendants offered "no evidence that [Mann] was not in the [pain] he allege[d]"]. Mann, 578 Fed.Appx. 274.

Here, however, Plaintiff has offered nothing more than the bare statements in his Complaint and "sworn statements" from himself and other prisoners that he was not allowed to shower (which Defendants are not disputing), and that he was placed in a restraint chair even though he was still complaining about the effects of the chemical agents. Plaintiff has offered no medical evidence to support this contention that he was in any kind of severe or significant physical distress; see House, 824 F.Supp. at 485 [Plaintiff's conclusory allegations insufficient to maintain claim]; and has in fact offered evidence contradicting this very claim in the form of his medical records. Bickerstaff, 196 F.3d at 455 [It is beyond cavil that a party may not create an issue of fact by submitting contradictory evidence and testimony.] (internal quotations and citations omitted). Further, not only do we have sworn statements from the Defendants and sworn statements from other third parties, but we also actual medical evidence, all showing that Plaintiff was seen and cleared by

---

[14]Aloe Creme Laboratories, Inc., 425 F.2d at 1296 [a federal court may take judicial notice of the contents of its own records].



medical personnel following these incidents, and was experiencing no problems with respect to having been subjected to chemical munitions, with one medical entry even noting that Plaintiff had been observed washing himself off in a sink.  Cf. Mitchell v. SCDC, No. 09-1010, 2010 WL 5174009, at * 3 (D.S.C. Nov. 16, 2010) [No constitutional violation where plaintiff had running water to wash off chemical spray], adopted by, 2010 WL 5173863 (D.S.C. Dec. 15, 2010).

Plaintiff cannot simply allege that he was still suffering from significant after effects from the chemical spray, provide no probative evidence to support this claim or to show that the Defendants wantonly ignored his condition other than his own self-serving statements, and expect to survive summary judgment, particularly in light of the substantial evidence to the contrary.  Cf. Sylvia Dev. Corp. v. Calvert County, MD., 48 F.3d 810,818 (4th Cir. 1995)[explaining that while the party opposing summary judgment is entitled to the benefit of inferences that can be drawn from the evidence, "[p]ermissible inferences must still be within the range or reasonable probability" and that ["w]hether an inference is reasonable cannot be decided in a vacuum; it must be considered in light of the competing inferences to the contrary" (internal quotation marks omitted)]; see, e.g., Riley v. Honeywell Technology Solutions, Inc., 323 Fed.Appx. 276, 278, n. 2 (4th Cir. 2009)[Holding that Plaintiff's "self-serving contentions" that he was subjected to unconstitutional treatment "were properly discounted by the district court as having no viable evidentiary support"]; Nat'l Enters., Inc., 201 F.3d at 335 [Holding that a self-serving affidavit was insufficient to survive summary judgment].

Therefore, the Defendants are entitled to dismissal of this claim.  Morgan, 829 F.2d at 12 ["Even though pro se litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"].

37



## IV.

### (Restraint Chair)

Plaintiff also asserts that his constitutional rights were violated by the Defendants' use of a restraint chair to restrain him following the two incidents at issue. With respect to the incident of May 26, 2011, Plaintiff alleges that he was "placed in a restraint chair for 10 hours without cause." With respect to the incident of June 20, 2011, Plaintiff alleges that he was "placed nude in the restraint chair [and] was kept in the restraint chair for 10 hrs."

As is the case with Plaintiff's other claims, Plaintiff's placement in a restraint chair does not in and of itself constitute an excessive use of force, as the use of devices such as restraint chairs or 4-point bed restraints have repeatedly been found to be constitutional when used appropriately. Rodriguez v. Taylor, No. 08-1027, 2008 WL 5244480, at * 8 (D.S.C. Dec. 15, 2008); Coleman v. McMillian, No. 12-916, 2014 WL 1249290, at * 5 (D.S.C. Mar. 26, 2014). Here, the evidence before the Court (including Plaintiff's own allegations in his verified Complaint) confirms that he was placed in a restraint chair immediately following both of the incidents which are at issue in this case, during which Plaintiff had been acting violently and engaged in threatening behavior towards prison staff. The fact that Plaintiff was placed in a restraint chair immediately after these events in order to make sure he was under control and would no longer constitute a danger to prison staff or even possibly other inmates does not give rise to a constitutional claim under the facts of this case. Cf. Williams, 77 F.3d at 763-764 [Finding that officers' decision to confine Plaintiff in restraints only minutes after the disturbance at issue in that case was a not unreasonable attempt to restore "order and control" to the situation]; Coleman, 2014 WL 1249290, at * 5 [Placement in restraint chair in order to prevent plaintiff from "disrupting the orderly operations of the facility as



38

well as potentially causing injury to himself, the staff, or the facility" found to be proper]. Rather, as was noted by the Fourth Circuit in Williams, the more difficult question is whether *continuing* to hold Plaintiff in a restraint chair for an extended period of time *following* the incidents at issue could give rise to a genuine issue of fact as whether a constitutional violation occurred. Williams, 77 F.3d at 764.

In Williams, the Fourth Circuit allowed the claim to proceed where the evidence showed that the Plaintiff was placed in four-point restraints and chained to a bunk for eight hours even though 1) he was in "immense pain" because of mace which he had not been allowed to decontaminate, 2) no medical personnel checked on his condition, and 3) he had not even been allowed to use the toilet. Id.; see also Mann, 578 Fed.Appx. 273-274 [Claim allowed to proceed where the evidence showed Defendants refused to allow Plaintiff to decontaminate for no reason]; Battle, 2013 WL 5203650, at * 9 [Finding that inference that prison guards were acting to punish, rather than to quell a disturbance, could be found where guards maintained prisoner in restraints for a long period of time while refusing to allow him to wash and denying him medical attention]. That is not what the facts show in this case. The undersigned has already discussed Plaintiff's decontamination claim; see, Section III, supra; and found it to be without merit. The remainder of the evidence, including Plaintiff's own testimonial and documentary exhibits, shows that Plaintiff was checked and cleared by medical upon being placed in the restraint chair on both occasions, and that he was thereafter removed from restraints at regular intervals, again checked by medical, and allowed to use the restroom and walk around (during which at least on one occasion he told staff to "get the f . . . from his room"), eventually being released (according to Plaintiff's allegations) after about a total of ten hours. While Plaintiff complains about the tightness of the handcuffs while in



the restraint chair on June 20, 2011, his own exhibits (medical records) show that when he complained, his handcuffs were "loosened and moved to a different position on [Plaintiff's] arm", that the wrist area was assessed with no injury being noted, and that Plaintiff "reported relief with handcuff being removed."

This Court has no doubt that being placed in a restraint chair is uncomfortable and unpleasant. However, just because Plaintiff was subjected to this form of restraint does not mean his constitutional rights were violated. Mackey v. Anderson County Detention Center, No. 06-1180, 2007 WL 1656231, at * 1 (D.S.C. June 5, 2007) [Finding detainee's placement in a restraint chair was not a per se constitutional violation]. At what time, or after how long a period of time, an inmate should thereafter be released is properly determined based on the inmate's demeanor in conjunction with considerations of officer safety based on past inmate actions and conduct and possibly other factors. As was noted by the Fourth Circuit in Williams, prison administrators are afforded discretion to determine what is necessary for the prison's internal security; Williams, 77 F.3d at 765; and while a decision on how long restraints may be continued calls for the exercise of good judgment on the part of prison officials, their decisions are entitled to deference as long as the evidence does not show their actions were taken in bad faith or for no legitimate purpose. Id.; Mann, 578 Fed.Appx. 274-275. There is no evidence here which shows that the Defendants use of a restraint chair under the facts of this case was malicious and sadistic such that it amounted to constitutionally excessive force.[15] Rather, Plaintiff was himself the admitted cause of his discomfort

---

[15]Indeed, restraints of up to 20 hours, twice the time period at issue in this case, have been found to be constitutional. Blakeney v. Rusk County Sheriff, 89 Fed.Appx. 897, 899 (5th Cir. 2004) [Pre-trial detainee's rights were not violated when he was placed in restraint chair for twenty hours after he disobeyed orders and engaged in unruly, destructive practices, since the purpose was not

(continued...)



on both occasions, and the courts should not second guess prison administrators who have to make real time judgments when dealing with volatile inmates in dangerous settings unless there is compelling evidence (considered in the light most favorable to the Plaintiff) that a constitutional violation has occurred. Boone v. Stallings, 583 Fed.Appx. 174, 175 (4th Cir. Sept. 11, 2014) ["Prisoner must meet a heavy burden to satisfy the subjective component - that prison officials applied force maliciously and sadistically for the very purpose of causing harm rather than in a good faith effort to maintain or restore discipline"] (internal quotes omitted); Johnson, 481 F.2d at 1033 ["not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"]; Coleman, 2014 WL 1249290, at * 5-6 [Where Plaintiff was regularly checked throughout the period of restraint and there was no evidence that Plaintiff was subjected to any serious physical distress during that time period, use of restraint chair was not malicious and sadistic in violation of Whitley].

Therefore, this claim is without merit and should be dismissed. See Whitley, 475 U.S. at 320-321 [Plaintiff carries a "heavy" burden to satisfy the subjective component of an excessive force claim; i.e., he must prove that correctional officers applied force "maliciously and sadistically for the very purpose of causing harm", rather than in a good faith effort to maintain or restore disciple]; Blakeney, 89 Fed.Appx. at 899 [Pre-trial detainee's rights were not violated when he was placed in restraint chair for twenty hours after he disobeyed orders and engaged in unruly, destructive practices, since the purpose was not punishment] [bench trial]; Rodriguez, 2008 WL 5244480, at * 9.

-----

[15](...continued)
punishment] [bench trial].



# V.

## (Medical Care)

Granting Plaintiff's claims the liberal construction to which he is entitled as a <u>pro se</u> litigant, it could also be gleaned from the allegations of the Complaint that Plaintiff is asserting a medical claim. Specifically, Plaintiff alleges that the Defendant Nurse Jones "denied Plaintiff medical treatment in spite of his pleas to her concerning the gas burning his skin. She refused to talk to or treat the Plaintiff nor would she instruct defs. to allow Plaintiff to shower to remove mace from his body/skin". However, these general and conclusory allegations, without more and in particular without any medical evidence to support his claims, are insufficient to survive summary judgment.

In order to proceed on such a claim Plaintiff must present evidence sufficient to create a genuine issue of fact as to whether any named Defendant was deliberately indifferent to his serious medical needs. <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Farmer</u>, 511 U.S. at 837; <u>Sosebee v. Murphy</u>, 797 F.2d 179 (4th Cir. 1986); <u>Wester v. Jones</u>, 554 F.2d 1285 (4th Cir. 1977); <u>Russell v. Sheffer</u>, 528 F.2d 318 (4th Cir. 1975); <u>Belcher v. Oliver</u>, 898 F.2d 32 (4th Cir. 1990). Plaintiff has failed to submit any such evidence. First, even according to Plaintiff's own allegations, he was in contact with Nurse Jones, as his allegation is that she would not provide him with the care or treatment he desired notwithstanding his requests. Plaintiff's own testimonial and documentary exhibits also confirm that he was seen by medical personnel after both incidents, that the head injury he sustained on May 26, 2011 was addressed and bandaged, and that Plaintiff's wrists were examined after he complained that his cuffs were too tight. Multiple exhibits from the Defendants (both documentary and testimonial) also confirm that Plaintiff was seen by medical personnel following both of these incidents (not just by Nurse Jones, but by some other nurses as well).



42

Plaintiff's disagreement with the manner in which Nurse Jones dealt with his complaints, which is evident from his statements in his affidavits and the affidavits from the other inmates, is not alone sufficient to establish a constitutional violation, particularly where Plaintiff has himself offered no medical evidence to show that he suffered any injury or harm as a result of Nurse Jones' actions. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985)[Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim absent exceptional circumstances]; Green v. Senkowski, 100 Fed.Appx. 45 (2d Cir. 2004) (unpublished opinion) [finding that plaintiff's self-diagnosis without any medical evidence insufficient to defeat summary judgment on deliberate indifference claim]; Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1188-1189 (11th Cir. 1994)["An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed"], overruled in part by Hope v. Pelzer, 536 U.S. 730, 739 n. 9 (2002); see also House, 824 F.Supp. at 485 [Plaintiff's conclusory allegations insufficient to maintain claim].

The medical evidence provided to the Court reflects that Plaintiff was seen by medical personnel following both of the incidents at issue in this lawsuit, and that other than a head laceration that was cleaned and dressed following the May 26, 2011 incident, Plaintiff was found to be in no difficulty and no distress and was having no medical problems.  While Plaintiff may not agree with the extent and nature of the medical care he received, he cannot simply allege in a conclusory fashion that he did not receive constitutionally adequate medical care or attention, otherwise provide no supporting evidence other than the subjective opinions of himself or other inmates, and expect to survive summary judgment, particularly when the Defendants have submitted medical records



(which Plaintiff has also filed as his own exhibits) as well as sworn testimony from a medical professional which refute his claims. Morgan, 829 F.2d at 12 ["Even though pro se litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]; see also Scheckells v. Goord, 423 F.Supp. 2d 342, 348 (S.D.N.Y. 2006) (citing O'Connor v. Pierson, 426 F.3d 187, 202 (2d Cir. 2005) ["Lay people are not qualified to determine...medical fitness, whether physical or mental; that is what independent medical experts are for."]); Levy v. State of Ill. Dept. of Corrections, No. 96-4705, 1997 WL 112833 (N.D.Ill. March 11, 1997) ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"].

While finding that no constitutional claim has been established, the undersigned does not intend to downplay or minimize Plaintiff's complaints. Being subjected to chemical spray and being placed in a restraint chair are serious matters; however, they are not in any of themselves unconstitutional, and Plaintiff cannot maintain a constitutional claim just because he was subjected to these conditions as a result of his own conduct. Plaintiff may, of course, pursue a claim in state court if he believes that the medical care he received as a result of the incidents at issue in this lawsuit constitutes malpractice. However, that is not the issue before this Court. Rather, we are concerned only with whether a constitutional violation has occurred; Estelle, 429 U.S. at 106 ["medical malpractice does not become a constitutional violation merely because the victim is a prisoner."]; and because the evidence before the Court is insufficient to raise a genuine issue of fact as to whether any named Defendant was deliberately indifferent to Plaintiff's serious medical needs, the standard for a constitutional claim, Plaintiff's federal § 1983 medical claim should be dismissed. See DeShaney, 489 U.S. at 200-203 [§ 1983 does not impose liability for violations of duties of care



arising under state law]; <u>Baker</u>, 443 U.S. at 146[§ 1983 claim does not lie for violation of state law duty of care]; <u>Estelle</u>, 429 U.S. at 106 ["medical malpractice does not become a constitutional violation merely because the victim is a prisoner."].

### Conclusion

Based on the foregoing it is recommended that the Defendant Harouff's motion for summary judgment with respect to Plaintiff's excessive force claim relating to being taken into custody on June 20, 2011 be **denied**, and that that claim be allowed to proceed against this sole Defendant. With respect to all of Plaintiff's remaining claims, and all other named Defendants, it is recommended that the Defendants' motion for summary judgment be **granted**, and that those claims and party Defendants be **dismissed**.

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

March 23, 2015
Charleston, South Carolina

45



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

